Representative Stacey Vetter. Did you know that you bear the name of one of the great Court of Appeals Justices? I do. Having grown up in South Arkansas myself, I actually knew him well. Yeah, he was a personal friend of all of ours. And it is an interesting experience to go into the courtroom in Little Rock. I'd like to start out by identifying a few things that I believe would be important to the Court to consider as it hears the argument. First, both Stacey Vetter and Christine McAtee pled and agreed in their pleadings in the pretrial conference that there was a partnership, and the purpose of that partnership was to sell patient boards. Second, all patient board sales prior to the partnership breakup had the Communicator trade name on them. Third, the jury found under a clear and convincing standard that Insignia fraudulently represented its ownership of the mark to the government. The whole thrust of the defense to the trademark claims was that it was the partnership that owned the mark, not Insignia, and that Christine McAtee knew it. Finally, all of the complaints that Insignia raises on this appeal, with just a couple of exceptions, were unpreserved below. They are therefore reviewed under a plain error standard, and Insignia has to show that any error was clear and obvious and not subject to reasonable debate. And with that, I would like to first address the issue of attorney's fees and whether this is an exceptional case under the Lanham Act. I assume that it is. The magistrate judge concluded that this issue had not been adequately presented in the final pretrial order. The record is clear. That is certainly true that she held that. But the record is clear that the parties had agreed prior to trial to submit the issue of attorney's fees to . . . But is it your argument that the parties agreed to themselves not to put it in the pretrial order, and so therefore it wasn't in there? My argument is that it's clear that the parties made that agreement, and it is . . . Why did you need to make that agreement? I don't think we actually did. I think that Rule 54D contemplates exactly that procedure. Well, I mean, I understand that you say you made that agreement. I pulled up your pretrial order, and it's extremely detailed, and you go through just about every conceivable issue, and I appreciate that. But there's just no mention there. I certainly concede it's not in there. Yes. And I think the reason why that happened from a practical standpoint is the agreement had been made. When did you tell the court above this agreement? I would have sworn on a stack of Bibles it was in the pretrial conference, but I will have to confess that having reviewed that transcript in preparation for today, I can't find it. I still think it probably happened somewhere. Doesn't it work into your favor that it was not in the pretrial order? I'm sorry? It works in your favor under Rule 54 if it was not in the pretrial order when it says that except as otherwise provided in an order or a statute, the motion for attorneys' fees will be provided by motion of the parties. I think that's right. I think it was just an abundance of caution that two parties reached that agreement to start with, and to be candid, I'm sure it was a mistake to not have included it in a statute. All the parties clearly intended to pursue those claims. We wouldn't have made the agreement otherwise. Again, there's no prejudice. My argument would be that the courts should go out of their way to enforce agreements that counsel have made that are designed to streamline the trial rather than punish them for essentially a clerical error in leaving it out when there clearly is no prejudice. Therefore, I argue that it was an abuse of discretion. Would a holding counsel, or maybe I should ask them, are they in agreement that there was an agreement made outside of court? Appellate counsel is different than trial counsel, so I'm hesitant to state that. There is, in the record, an email exchange between counsel confirming that agreement. Okay. The reason why we think that this is an exceptional case that justifies attorneys' fees obviously goes back to the Octane Fitness case. Respectfully, it seems to me that the district court applied the wrong standard in determining whether this was an exceptional case. The district court's order denying the request for attorneys' fees . . . Did anyone argue to the magistrate judge that this was waived? Or was this something that just came from the magistrate judge? No. The counsel for insignia raised that issue post-verdict. And that's the same lawyer that you had an agreement with? Yes, Your Honor. That's true. And their agreement was in writing? No. It was an email exchange. Well, you know, I was a district judge for a fair amount of years. I darn sure would enforce the . . . if the parties agreed with those things, I'd expect all these lawyers to honor their agreement. I kind of think this court does too. So . . . Thank you, Your Honor. It seems to me that the district court applied the wrong standard in analyzing whether this was an exceptional case. The order specifically, the words that predicated the denial are, there being no clear and or objective evidence of bad faith or improper motive on the part of insignia vis-à-vis the trademark and trademark infringement claims. That is essentially verbatim out of the previous federal circuit law interpreting the statutory language exceptional prior to octane fitness. And the whole purpose of the octane fitness ruling was to reject that standard and adopt a less burdensome one. And the standard that octane fitness in this court has now applied in the trademark situation is two-pronged, an analysis of the substantive strength of the parties or whether there was some unreasonable manner in which the . . . What is your position if we decide that it was not waived? Should we remand it? I do not think that's necessary because I think the court can hold as a matter of law under the circumstances of this case that it is exceptional. And the reason for that is that there was this finding of fraud under a clear and convincing standard. What about the amount? Well, the amount was . . . Yes, Your Honor. The amount would have to be remanded for a determination by the district court. And our position is that if all of the . . . I shouldn't say all. Virtually all of the Lanham Act claims that were brought by Insignia including the trademark infringement, all the cyber piracy stuff that's not before the court now but which took up a lot of the trial court time, all of that is predicated on the federal registration. And if that factual underpinning was based on a fraud,  otherwise the statute has no meaning. If fraud in the creation of factual underpinning of the case does not create an exceptional case as a matter of law, then I would suggest that the statute is essentially meaningless. Let me also address the issue with regard to whether there was any evidence presented that McAtee individually sustained any damages. The record is replete with evidence that McAtee claimed to have sustained and conducted all her business through this corporation, Insignia Marketing. She did not sell any products or receive any revenue individually. It all went through the corporation. The Insignia Marketing was the franchisee of AIA, Ventures in Advertising, all of the proceeds that she received, all the revenues she received actually went to Insignia Marketing. After the partnership breakup, the record shows that McAtee rebranded these patient boards that she was selling under a trade name by the name of Visacare. Any possible post-breakup damages that were sustained were sustained as a result of lost sales of Visacare products by Insignia, not by Christine McAtee individually. They kind of want it both ways here. They want to claim that Insignia is entitled to all of the interpled funds by AIA, which were funds based on sales generated during the partnership. They want to claim that Insignia gets those, but then they want to say that she individually is entitled to post-breakup damages. And I just think there's an inconsistency there, and it's just a simple matter of distinguishing between the individual and the corporate entities. Your Honor, at this time, that is all that I have with regard to the affirmative positions of the opponents. Well, are you proposing to come back and— Proposing to come back and rebuttal with respect to the affirmative claims of— I would request that, yes. Thank you very much, Mr. Arnold. Thank you. Mr. Baraglotz, representing Ms. McAtee, will hear from you. May it please the Court. We are here seeking a redress for fundamental errors that occurred at the trial that resulted in Insignia Marketing losing valuable trademark rights. Here, I'd like to focus on two of those errors that really underpin all of the ultimate findings and rulings of the jury, and I think they're extremely significant and constitute plain error. First, the settlement communications that were admitted by the trial court. Those necessarily had many statements that ultimately must have affected the jury deliberations. Those are essentially the statements that the jury would have had to rely on to find much of the fraud, cancellation, and non-use findings that they did. Without those communications, ultimately, there would only have been the statements of Christine McAtee, the principal of Insignia, and Stacey Vetter, the defendant below and appellant here. Which of these arguments did you level an objection to at trial? Are you here on plain error on all of these evidentiary rulings? Essentially, it's plain error on everything. In the record, there is one objection to the introduction of exhibit. What's the one you reserved? It was on the non-use, essentially the abandoned one. That would be under an abuse of discretion. The rest are indeed plain error, and that's what we're under here. We do think, though, these are plain error. I imagine being a layperson, reading these settlement communications, which do say things that undoubtedly undermine our client's position, which do have what would essentially be admissions, but that's why we have Rule 408, so that people can, especially laypeople, if this were a lawyer, we'd have all the language about without prejudice and everything like that, and we'd have a discussion that we'd know wouldn't come in. But laypeople don't do that. They shoot each other emails, they have discussions, and they should be allowed to speak freely. We have strong policy on this. And here, 408 says it's any statements or conduct during discussions. It doesn't say they constitute those discussions. We understand that the arguments below were mostly about, well, these are statements of frustration. Indeed, they were. But in the context of settlement, attempts to resolve this without having to be here or try. How are you prejudiced by that? Well, inevitably that undermined our client's—the assessment of our client's credibility. Okay. Just what—tell me what part of the emails underline the credibility or challenge the credibility of the client? For what— I'm just saying, explain in detail how you were prejudiced. So the emails talk about the—one of the main statements that we don't want anything to do with the communicator mark going forward. Well, of course that necessarily undermines the intent—the element of intent to resume use, which in fact our client did resume use, but necessarily that would undermine that position. There are statements about—I think it also undermines the fraud on the PTO claim. So our client, of course, it's replete with her belief that Insignia owned the mark. If you take that settlement communication and if you're assessing it, necessarily you'd start thinking, well, if she wants nothing to do with it, then she must have been trying to deceive the Patent and Trademark Office. When, no, of course she always believed that Insignia owned the mark. And how could the jury then have any kind of—with that before it, how could it believe that our client was, in fact, being credible in statements that were during trial? You know, one of the difficulties of facing an arrogant plain error is that if this error was so conspicuous and so prejudicial, why would the counsel blow the silent about every one of them? The fact that you don't object is certainly relevant to what the actual impact of this material was, assuming competent trial counsel. There was a motion to eliminate at trial, and the trial court said that she would put that—the trial court put that off her decision until later. I can't sit here and tell you that they objected during the actual introduction. They didn't, and that's why I'm here arguing that this is so fundamentally— I understand your difficulty. I'm just trying to understand, to get a handle on Judge Dover's question, which I think is exactly the question you have to answer, and I'll answer what's the prejudice to that. That, among other things, you have to demonstrate on plain error. Not only that, it would be really insulting the system to allow this to go forward. As I sit here and I—obviously, I'm trying to convince you that when you have settlement communications, it so undermines Rule 408, and it's true. Trial counsel did not object at the time. They may have good reason not to. Sometimes it's best not to object. You may think that it's better to do so with a jury. You don't want to do that. You might have come in to give the jury the sense you don't think there's much to that. There are lots of reasons trial counsel do things, and very good trial lawyers oftentimes don't preserve and don't make the objections that appellate counsel would like in a pure sense to make. That's the difference between trying the case and handling it on the field. I certainly understand that there are different needs in trial counsel. But, however, here we have a fundamental Rule 408 policy, and I think that's what we're asking you to see. Thank you. I mean, couldn't it be characterized as more of a demand than an offer to compromise? I mean, is it a fact question to decide what it was, and couldn't there be an argument made that it was a demand and not really an offer to settle the case? I think in the context of the chain of emails, and there are a number of them, it leads off with attempts to resolve this dispute to then have both the parties move away from the particular brand and then essentially offer rejection, offer rejection, and then certain expressions of frustration that offers were being rejected. And I think 408 talks about during discussions. So even if there are things in there that aren't necessarily strictly to settlement, I think that's why we have 408, especially for laypeople. They're talking back and forth. We have to have some policy preserving that ability. Otherwise, all these things will be led into . . . I mean, at the end of the day, there was a motion in it, and it wasn't ruled upon. In fact, it was never ruled upon. So we have to be able to preserve that because we need to . . . Had there been an objection, the judge could have evaluated it and made a determination as to what was the purpose and whether it was a demand or whether it was a settlement. But without an objection, the judge's hands were tied to make that determination. And that's why I'm here arguing that it's plain error to let those in. This fundamentally undermined the fairness of the trial under the Fifth Circuit standard for plain error. Of course, had they objected at trial . . . that affected your substantial rights, whether it really affects the integrity of the proceeding. And it seems to me that . . . I just can't see that . . . And you haven't convinced me that it amounts to prejudice so great that some injustice has been done that questions the result of the jury. Well, the injustice ultimately is that our client lost a substantial right, the trademark registration and then arguably the trademark itself, though it's unclear. But that's a substantial right that the Supreme Court has acknowledged recently. I understand. Given a substantial right that you have, I mean, still, it doesn't seem to me that the prejudice against the right your client was asserting is so great that the integrity of the court requires reversing on some objection that was not made. I mean, you can try again if you want just this huge amount of prejudice. I just don't . . . it seems like the jury . . . I guess your client testified and they could judge your credibility. I think that affects . . . admitting these communications affects their ability to judge your credibility. Because once they're in, they're seeing these things that would be like any other offer of compromise. It seems to undermine the litigation position. Let's go back to Judge Prado's point about our contemporaneous objection rule really contemplates that you make these objections so that the district court will have the opportunity to correct them. There's a threshold determination here to be made about the posture of the context in which this statement was made. It's not obvious from the face of this thing, just reading it, that it's necessarily settlement of the context. But that, without objection, the district court was not able to make that. And now to come down and to argue and to go the other way as to anything, that really casts doubt on the integrity of our rules of contemporaneous objection. I think here you're faced with what I consider some of the tough position, which is that these . . . Of course, I'm arguing that there are settlement communications because they talk about we've got to try to resolve this. Otherwise, it goes into a legal course of action, I think is the . . . And so as I look at it on its face, these are attempts to resolve. Now, it's true that on the motion in the limine pre-trial, the trial court put it off. It had, in fact, called them settlement efforts, but it wasn't raised. And so my argument to you is once those are in, that fundamentally affects the policies on Rule 408. That's where even in . . . What was done with this information and arguments to the jury, if anything? What use did counsel make of this in arguments for the jury, if any? They make extensive use of it in closing argument. And that, I think, shows the importance of it. It really is . . . it really was crucial to their whole defense of the trademark . . . And there was no objection made at that time either? No. And the second . . . If I may, on the second point that I have that's, I believe, fundamentally undermined the fairness of the trial, which is statement in closing argument that, in fact, our client . . . The principal of our client told her that . . . The lawyer to the principal of our client told her that she did not have use sufficient for a trademark application. This, too, was not objected to during closing argument. But here we have a statement . . . Let me take you back to this question of waiver again. What is your understanding of the record with regard to agreement of counsel? This is about the point that was raised earlier with respect to waiver of attorneys' fees. I'm shifting gears on that. So, from the record as I read it, I understand that there was an email with an agreement, but then after trial there was an argument by trial counsel for Insignia and Ms. McAtee that said that it was indeed waived by not being in the trial order. In the pretrial order, sorry. I guess I don't understand. Yeah, there was an agreement. What was the agreement then? I honestly do not recall the email well enough, but I believe there was an email. What does the email say? Do we have a copy of that? If we do, I don't have it in the materials I have here in front of me. Well, maybe Ms. Arnold will share that with us on the bottom. I will say this on that point because that seems to be a matter of great interest. Even if you put to the side whether it was an abuse of discretion of the trial court to hold there was a waiver, there's a post-trial ruling saying this was not an exceptional case. And I think there is literally no authority saying that fraud on the part of a trademark office, which is a claim that only affects the registration, could be the basis for finding an exceptional case. There's nothing since Octane certainly. And under Octane, we have to look at the totality of the circumstances when we do that. Insignia and Ms. Magaty actually were the prevailing party, I think. They're the ones who won damages on the partnership claims. They won a multiple false advertising claim. And as far as the trademark counts themselves, while they did not prevail on those, I think if you look at the ultimate rulings by the jury, they were based on these two statements that I think really would have infected their understanding of our client's intent. And there does need to be subjective intent. I think the record has virtually nothing on that. There can't be a finding of an exceptional case with nothing, and again, not a prevailing – they weren't the prevailing party. I think right there, that cuts off their ability to have a finding of an exceptional case in and of itself, apart from the fact of the post-trial ruling that it was not an exceptional case. And that wouldn't necessarily involve this panel looking at it as an abuse of discretion on that point as well. And they didn't argue that in their briefing. There is no argument about abuse of discretion on the finding of no exceptional case. They did argue about it on the waiver. And I think – they don't have anything. I have nothing to rebut. They didn't make that argument. And so I think there, basically, the trial court's finding of non-exceptional case has to stand. I think you were going to make a second point with respect to the introduction of the emails. My second point was going to relate to the statement in closing by trial counsel for Ms. Vedder saying – sorry, I'd like to quote it for you. The lawyer tells her, well, you can't do that because you haven't been using it. That statement in closing must have been highly prejudicial to insignia. Certainly, that's advice of counsel that never – of course, never got brought up. There's no evidence supporting that claim. In their briefing, they talk about an inference to the extent there could be a factual inference. I don't think it could be about what our clients then trained our counsel said to her. Well, how would he know? I mean, how did he possess the information so that the jury would find that credible? Counsel had actually said that to the other side. If the jury dismissed it, I would think if they were just ordinary – an ordinary listener to the comment that he's making up this story, like, and they said so and so, and then this is what she did. I mean, he didn't – he didn't read it. I mean, it just doesn't sound like it was the kind of statement that would have credibility for the point that you're making. I think if you're a lay jury and you hear someone in closing – we had four days of testimony before that, and then they come back and they hear in closing the lawyer told her she can't do it, I think that would have a strong effect. We – you know, we're lawyers. We kind of know how these things go. If they hear you went against the advice of counsel, it's essentially what it is. No. On the other hand, I mean, I think the average man in the street has a lot more intelligence than most lawyers and judges for that matter. I mean, in dealing with common, ordinary things. That's fair enough. I do think presenting it as our client did something against the advice of her lawyer, I think that would be – That's why we have juries, I think. Well, we have them, but they have to have proper evidence before them. And certainly, I mean, we – as a trademark lawyer, we often use either advice of counsel defense or going against the advice of counsel to show willfulness. It's very fundamental to the way that we practice when it comes to trying to show guilt. And I think that's because the lay jurors understand, oh, he did something the lawyer said not to do. I think that would substantially affect them. Your argument comes down to I think this is a mine run case and the attorney's fees aren't contemplated. It's not exceptional. On that point, it's not exceptional from their standpoint. That was an alternative basis of the district court's ruling. And that was an alternative basis of the court block. Yes. If you have no other questions, that's my answer. Thank you very much. Thank you, sir. Mr. Arnold, you have time for rebuttal. Mr. Arnold, what was the pickup on that last point? Why is this an exceptional case? The warrant attorney's fees don't matter at all. It is our position that because of the jury finding, based on a clear and convincing standard, that there was fraud in obtaining what essentially was the factual underpinning of the lawsuit. Virtually all of the claims are brought by insignia. That common sense dictates that that means it's exceptional. It's a very straightforward argument from my standpoint. I mean, not all copyrights are set aside on the basis of fraud. There are many other reasons to set it aside. And you're just saying that fraud makes it exceptional in the sense that attorney's fees serve somehow as punishment for the egregious conduct of the losing party? I would not use the word punishment. I don't think that's—it's not a measure of damage. Surely exceptional contemplates that the proceedings were sufficiently complicated and demanding of resources of counsel, etc., etc., and costly for those reasons in an exceptional fashion so as to offset that cost. I would certainly agree with that, and I certainly think this case fits that parameter. Why? Well, this is not part of the trial court record, of course, but, I mean, there was years of this— We better not go there, then. I mean, it's in terms of—I think you can look at what is in the file and is in the record and see that there was a lot of work that Vedder, her husband, several of her co-workers had to defend themselves on this claim for years. There's enough in the record to determine that. To the extent that the record allows one to extrapolate the fact of the background of the case, how long had it been going on before it finally was resolved, before the jury resolved it? I mean, well, I don't know. Just more or less. Three years, I think. I'd have to look at the numbers literally to approve it. Who are you talking about? I think the original lawsuit was filed in August of 2012, and the trial was in April of 2015. Three years to trial. It took you three years to get to trial before my district. It was a complicated case. All right, Mr. Stone, anything further? Well, let me respond to a couple of things. With regard to these so-called 408 emails, the court probably needs to look at those. I mean, they really are not, in any true sense, compromise negotiations. They are how to calibrate the cabbage documents. Surely not every exchange of writings between parties after the breakup of a business relationship constitutes compromise negotiations. And I would just simply submit that these really don't fit that category. How long did it take to trial this case? How many trials? Five days. Five trial days? Well, I guess the fifth day was actually jury deliberations, but yes. Four trial days, yes. It was argued on the fourth day? The court put, the magistrate judge put a time limit on the trial on each side. I believe it was ten hours, if I remember correctly. Ten hours? I may be wrong about that. Maybe it was 20. I honestly don't remember. But there was a limit. With regard to the issue of the comment made during closing argument with respect to what Ms. McAtee may have been told by trial counsel, I mean, excuse me, by intellectual property counsel, the issue is whether this is a fair inference from the... You've got a red light on, so you might not... There was all sorts of evidence that she got served with the original complaint in this case, went and saw the intellectual property lawyer, hadn't used the mark for years, and then suddenly two weeks later goes and buys a product from a supplier with the mark on it and gets it registered. Okay. Thank you, Mr. Allen.